**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**JAMAL CRAIG,**

             **Plaintiff,**

**v.**                                                          **CIVIL ACTION NO. 1:15cv221**
                                                                **(Judge Keeley)**

**MICHAEL WEAVER;
EDDIE ANDERSON; and
T. SAVIDGE,**

             **Defendants.**

## REPORT AND RECOMMENDATION

### Procedural History

Plaintiff initiated this action on November 30, 2015, by  filing a complaint

pursuant to Bivens v. Six Unknown Named Agents of the Bureau of Narcotics, 403 U.S.

388 (1971), a case in which the Supreme Court created a counterpart to 42 U.S.C. §

1983 and authorized suits against federal employees in their individual capacities.  ECF

No. 1. On December 1, 2015, Plaintiff was granted leave to proceed *in forma pauperi*s

[ECF No. 6], and on December 28, 2015, he paid the required initial partial filing fee.

ECF No. 10.  On November 28, 2016, Plaintiff was directed to re-file his complaint on

the court approved form in conformity with the Local Rules of Prisoner Litigation. ECF

No. 22. On December 12, 2016, Plaintiff complied with that Order [ECF No. 26], and on

March 13, 2017, an Order to Answer was entered. ECF No. 27. After multiple

extensions of time were granted, Defendants filed a Motion to Dismiss, or alternatively,

for Summary Judgment on August 31, 2017. ECF No. 48. A Roseboro Notice was

issued on September 5, 2017 [ECF No. 53], and on October 6, 2017, Plaintiff filed a

response. ECF No. 60. This case is before the undersigned for a Report and Recommendation on Defendants' dispositive motions.

### Contentions of the Parties

A. Complaint

In his complaint, Plaintiff alleges that on May 20, 2014, he fell from his upper bunk at FCI Gilmer. Plaintiff further alleges than an x-ray taken the next day revealed a fracture of his collarbone. Plaintiff maintains that a contract orthopedist determined that he would need surgery within two weeks. However, Plaintiff also maintains that he was not examined by the orthopedist until July 7, 2014. Plaintiff alleges that by then, the fracture had begun healing on its own. Plaintiff continues his complaint by noting that at the time he filed his court approved complaint in 2016, he still had not been provided the recommended surgery, and he continues to suffer severe pain because his collarbone has "self –healed" incorrectly. Plaintiff alleges that as a result of Defendants' deliberate indifference, he has been rendered incapable of performing certain tasks and anything requiring physical exertion is impossible. For relief, he seek punitive, exemplary and compensatory damages in the amount of $2,000,000 as well as injunctive relief to include retraining of all medical staff involved and a prohibition against the Bureau of Prisons returning him to FCI Gilmer.

B. Motion to Dismiss or, in the Alternative, for Summary Judgment

In their motion to dismiss or, in the alternative for summary judgment, Defendants allege that the complaint is procedurally barred because Plaintiff has failed to exhaust all available administrative remedies. In the alternative, Defendants allege the complaint is without merit because Plaintiff has failed to show that Defendants have violated the Eighth Amendment to the United States Constitution. Also in the alternative,

Defendants allege that the complaint fails to present any cognizable constitutional violation, and therefore, they are immune from <u>Bivens</u> liability. Finally, Defendants maintain that Plaintiff's request for injunctive relief is not cognizable in the context of a <u>Bivens</u> law suit, nor has he established that he is entitled to injunctive relief.

C. <u>Plaintiff's Response to the Motion</u>

In his response to Defendants' motion, Plaintiff contends he fully exhausted his administrative grievances prior to filing this action. More specifically, Plaintiff maintains that the affidavit attached to his complaint establishes that he completed the grievance process when he filed his BP-11 in a timely manner, and after receiving no response within 60 days, he was permitted to consider the grievance denied.  Therefore, Plaintiff argues that his case is not subject to dismissal for failure to exhaust administrative grievances. Plaintiff also argues that Defendant Weaver was aware from prior falls that the institution was not safe, yet failed to correct the deficiencies which resulted in his fall and injury. In addition, Plaintiff contends that he has shown how each Defendant is personally responsible for his fall and the failure to render adequate medical care. He also maintains that re ipsa loquitur applies in this matter because "[i]t is common knowledge, by any layman as well as by medical professional, that surgery following a broken collarbone is standard procedure."[1] ECF No. 60 at 10. In summary, Plaintiff asserts that there are material issues of fact that are in dispute, and therefore, Defendants' Motion to Dismiss cannot withstand scrutiny. Furthermore, Plaintiff

---

[1] It appears that Plaintiff may be confusing the concept of negligence versus deliberate indifference. In a FTCA claim, a plaintiff is generally required to provide a screening certificate of merit pursuant to W.Va. Code § 55-7B-3(a) unless the doctrine or res ipsa loquitur applies. As discussed in more detail in the body of this Report and Recommendation, any attempt by Plaintiff to pursue a FTCA is barred by the statute of limitations applicable to the same.

maintains that the Motion for Summary Judgment does not fit well because there has been no discovery yet.

## Standard of Review

A. <u>Motion to Dismiss</u>

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).  In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. <u>Mylan Labs, Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir.1993); <u>See Also</u> <u>Martin</u> at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief."  <u>Conley</u> at 45-46.  In <u>Twombly</u>, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Twombly</u> at 554-55. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." <u>Bass v. E.I. DuPont de</u>

Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003).  In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).  Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim.  Id.

Plaintiff is proceeding *pro se* and therefore the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520-1 (1972) (per curiam); Erikson v. Pardus, 551 U.S. 89, 94 (2007); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). However, a court may not construct the plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

B.  Motion for Summary Judgment

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party."  Celotex Corp. V. Catrett, 477 U.S. 317, 322-23 (1986).  The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist.  Anderson v. liberty lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  Celotex at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Electric Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  Id.  This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson at 256.  The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment.  Id. at 248.    To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]."  Id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).  Such evidence

must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation.  Anderson at 248.  Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  Matsushita at 587.

## Analysis

A. Failure to Exhaust Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in 1997(e)(a) is mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001). A Bivens action, like an action under 42 U.S.C. § 1983, is subject to the exhaustion of administrative remedies. Porter v. Nussle, 534 U.S. 516, 524 (2002). The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," and is required even when the relief sought is not available. Booth at 741. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted prior to filing a complaint in federal court. See Porter , 534 US at 524 (citing Booth, 532 US at 741) (emphasis added). Moreover an inmate may procedurally default his claims by failing to follow the proper procedures. See Woodford v. Ngo, 548 U.S. 81 (2006) (recognizing the PLRA provisions contain a procedural default component).

The Federal Bureau of Prisons ("BOP") makes available to its inmates a three level remedy process if informal resolution fails to achieve sufficient results. See 28 C.F.R. § 542.10, et seq.  Within 20 calendar days of the date of the occurrence on which the complaint is based, an inmate may file a written complaint with the institution

7

on the proper form which is known as a BP-9. See 28 C.F.R. § 542.14. If the inmate is not satisfied with the institutional Warden's response, he may appeal to the Regional Director within 20 calendar days of the Warden's response using a BP-10. See 28 C.F.R. § 542.15(a). Finally, if the prisoner has received no satisfaction, he may appeal to the Office of General Counsel by filing a BP-11 form within 30 days of the date the Regional Director signed the response.[2]  An inmate is not deemed to have exhausted his administrative remedies until he has filed his complaint at all levels.  28 C.F.R. § 542.10-542.15; Gibbs v. Bureau of Prison Office, FCI, 986 F.Supp. 941, 943 (D.Md. 1997).

The exhibits provided by Defendants, establish that Plaintiff arrived at FCI Gilmer on November 19, 2013, and remained incarcerated at that facility until December 1, 2015, when he was transferred to the Federal Medical Center in Lexington, Kentucky. ("FMC Lexington"). In addition, the exhibits establish that Plaintiff filed two grievances requesting surgery on his clavicle. The first was filed on June 17, 2014, while Plaintiff was still at FCI Gilmer and was assigned grievance number 783304-F1. ECF No. 49-1 at 13. The grievance was denied on July 1, 2014. Id. Plaintiff did not appeal the grievance beyond the institutional level, and he does not dispute that he failed to exhaust that grievance.

---

[2] "If accepted, a Request or Appeal is considered filed on the date it is logged into the Administrative Remedy Index as received.  Once filed, response shall be made by the Warden or CMM within 20 calendar days; by the Regional Director within 30 calendar days; and by the General Counsel within 40 calendar days...If the time period for response to a Request or Appeal is insufficient to make an appropriate decision, the time for response may be extended once by 20 days at the institutional level, 30 days at the regional level, or 20 days at the Central Office level. Staff shall inform the inmate of this extension in writing. Staff shall respond in writing to all filed Requests or Appeals.  If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level." 28 C.F.R. § 542.18.

The second grievance was filed on August 8, 2014, after Plaintiff arrived at FMC Lexington and was assigned grievance number 789697-F1. The grievance was closed at the institutional level on August 21, 2014. Plaintiff appealed to the Regional Director on September 2, 2014, and it was closed on October 1, 2014. Defendants maintain that Petitioner did not appeal this grievance to the BOP General Counsel, and therefore, they allege that this grievance is not exhausted.  However, as part of his complaint, the Plaintiff noted that he received the response from the Regional Director on October 3, 2014, and submitted his appeal to the Central Office on October 7, 2014, through the institutional mailroom.  After the procedural response time of 60 days[3] had elapsed, Plaintiff considered the grievance to be denied and filed his complaint with this Court. In addition to his explanation in the complaint, which Defendants did not address, in his response to their motion, Plaintiff submitted a detailed description of how the grievance procedure works, and why he cannot provide a copy of his appeal to the Central Office. ECF No. 60 at 2-4. Although Defendants could have filed a reply, and presumably produced a mailroom log or affidavit disputing Plaintiff's claim, they did not.

An inmate does not need to demonstrate exhaustion of administrative grievances in his complaint. Jones v. Bock, 549 U.S. 199 (2007); see also Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008) ("[I]nmates need not plead exhaustion, nor do they bear the burden of proving it"). Instead, failure-to-exhaust is an affirmative defense that the defendant must raise. Jones, 549 U.S. at 216. Although Defendants have asserted this affirmative defense, it is clear that there are disputed facts which they have not surmounted. Therefore, the undersigned finds that dismissal for failure to exhaust would

---

[3] The 60 days is comprised of the 40 calendar days for response by the General Counsel plus the 20 days extension permitted at the Central Office level.

be inappropriate.

B. Federal Tort Claims Act

Although Plaintiff did not name the United States as a defendant, nor did he give any specific indication that he was seeking relief under the Federal Tort Claims Act ("FTCA"), he did attach to his complaint a copy of a December 9, 2014, letter from the BOP denying his administrative tort claim assigned the Number TRT-MXR-2014-04272. In his administrative claim, Plaintiff sought $250,000 for the alleged failure of FCI Gilmer staff to treat him appropriately for an injury he received when he fell out of his upper bunk. ECF No. 26-1.

It is well-established that the United States is immune from suit unless it consents to be sued. See United States v. Testan, 424 U.S. 392 (1976). However, the FTCA waives the federal government's traditional immunity from suit for claims based on the negligence of its employees. 28 U.S.C. § 1346(b)(1). Specifically, "[t]he statute permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." Medina v. United States, 259 F.3d 220, 223 (4th Cir. 2001). Nonetheless, the FCTA only waives the government's sovereign immunity if certain terms and conditions are met. Honda v. Clark, 386 U.S. 484 (1967). One of those conditions is that an administrative claim be filed with the appropriate agency within two years of the incident, and the FTCA complaint be filed within six months of the final claim denial by the agency. 28 U.S.C. § 2401(b). This time limitation is jurisdictional and not waivable. Kielwien v. United States, 540 F.2d 676, 679 (4th Cir.) cert. denied, 429 U.S. 979 (1976).

Here, Plaintiff presented his claim to the appropriate agency well within two years from the date of the event.  As noted, Plaintiff's claim was denied on December 9, 2014. In the letter of final denial, Plaintiff was correctly advised that he had six months from the date of the denial to bring suit in federal court.  ECF No. 26-1 at 13.  Six months from the date of final denial was June 9, 2015. The plaintiff did not initiate the instant action until November 30, 2015.  Therefore, the plaintiff's claim is clearly time-barred.

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun *within six months after the date of mailing*, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b).

Because the FTCA waives the United States traditional grant of sovereign immunity, the statute must be strictly construed.  United States v. Kubrick, 444 U.S. 111, 117-18 (1979).  Put simply, because the United States may not be sued without its permission, the Court may not take it upon itself "to extend the waiver beyond that which Congress intended."  Id.  Therefore, "[i]f an action is not filed as the statute requires, the six-month time period may not be extended" by the Court.  Tuttle v. United States Postal Service, 585 F.Supp. 55, 57 (M.D.Pa. 1983) (citing Kubrick at 117-18.)).

Furthermore, equitable tolling in suits against the United States is only available in exceptional circumstances.  See Muth v. United States, 1 F.3d 246, 251 (4th Cir. 1993).  Therefore, equitable tolling is only available when a claimant has exercised due diligence in preserving his legal rights, id., or can show that the defendant "attempted to mislead him and that the plaintiff reasonably relied on the misrepresentation by

neglecting to file a timely charge."  See English v. Pabst Brewing Co., 828 F.2d 1047, 1049 (4th Cir. 1987).

In this case, the BOP clearly informed Plaintiff that he had six months from the date of denial to file suit in federal court.  Plaintiff cannot argue that he was misled by the agency, nor did the agency make any misrepresentations.  Moreover, given that the instant complaint was filed almost 12 months after the administrative tort claim was denied, Plaintiff's lack of diligence does not comport with a finding of equitable tolling. Accordingly, to the extent Plaintiff was attempting to raise a claim under the FTCA, the same is due to be dismissed as untimely filed.

C.  Official Capacity

In the style of his complaint, Plaintiff names each Defendant in both his official and individual capacity. Although Bivens recognizes a personal-capacity cause of action for damages against federal officials for violations of federal constitutional rights, Bivens does not operate as a waiver of sovereign immunity for actions against the Federal Government and its agencies. Bivens, 403 U.S. at 397. Therefore, a Bivens damages action may not be maintained against federal agencies or the United States. FDIC v. Meyer, 510 U.S. 471, 484 (1994). Moreover, "[a] suit against a federal official for acts performed within his official capacity amounts to an action against the sovereign." See Thourston v. United States, 810 F.2d 438, 444 (4th Cir. 1987) (citing Portsmouth Redevelopment & housing Authority v. Pierce, 706 F.2d 471 (4th Cir. 1983).  Therefore, a Bivens action will lie only against named federal officers or their agents in their personal capacity. Myer, 510 U.S. at 484. Accordingly, to the extent Plaintiff is seeking

damages against Defendants in their official capacity, the same is barred by sovereign immunity.

      D.    <u>Michael Weaver</u>

An action under Bivens is similar to an action under 42 U.S.C, § 1983, except the former is maintained against federal officials for constitutional violations, while the latter is against state official for violations of constitutional or other federally protected rights. <u>See</u> <u>Carlson v. Green</u>, 446 U.S. 14, 18-19 (1980) (applying <u>Bivens</u> in prison context); <u>Butz v. Economous</u>, 438 U.S. 478, 504 (1978). Under <u>Bivens</u> or § 1983, the plaintiff must show that the defendant's personal conduct violated his rights. <u>Trulock v. Freeh</u>, 275 F.3d 391, 402 (4th Cir. 2001) (<u>Bivens</u>); <u>Vinnedge v. Gibbs</u>, 550 F.3d 926, 928 (4th Cir. 1977) (finding that1983 "liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights" because "[t]he doctrine of respondeat superior has no application under this section.") (internal quotation marks and citations omitted).  Therefore, to establish liability under <u>Bivens</u>, a plaintiff must specify the acts taken by each defendant which violate his constitutional rights.  <u>See</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994); <u>Colburn v. Upper Darby Twp</u>., 838 F.2d 663, 666 (3d Cir. 1988).  Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown.  <u>See</u> <u>Zatler v. Wainright</u>, 802 F.2d 397, 401 (11th Cir. 1986).

Here, Plaintiff identified Defendant Weaver as the FCI Gilmore Health Services Administrator and asserts that he is "responsible for the health, safety and welfare of all inmates under his care." ECF No. 26 at 2. In his complaint, Plaintiff never alleges that Defendant Weaver was personally involved in evaluating or treating his collarbone. In

addition, Plaintiff never alleges that Defendant Weaver was personally involved in any decisions that delayed or diminished the medical care provided him. In fact, other than naming him as a party to this action, Plaintiff never again mentions Defendant Weaver. Therefore, the complaint fails to present the personal involvement necessary to maintain a Bivens action against Defendant Weaver.

In his response to Defendants' Motion, Plaintiff alleges for the first time that Defendant Weaver knew from prior falls that the institution was unsafe and failed to correct the deficiencies resulting in his fall. ECF No. 60 at 6. Plaintiff expands on this allegation by indicating that he had reported two prior falls, but Defendant Weaver did nothing to correct the deficiency in the housing units of inmates and "as such, should have known, as any reasonable person would, that his failure to act could result in, and would result in injury to those committed to his care and control." ECF No. 60 at 7.

Plaintiff's allegation in his response amounts to an entirely new claim against Defendant Weaver. However, "[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed R Civ P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." Barclay White Skanska Inc. v. Battelle Memorial Institute, 262 Fed.Appx. 556, 563, 2008 WL 2385622 (4th Cir. January 29, 2008) (citations omitted). Moreover, it is clear that Plaintiff did not raise any reference to the safety of the bunk beds at FCI Gilmer in his administrative grievances, and therefore, this "new claim" is not exhausted. Therefore, Defendant Weaver is entitled to be dismissed from this action.

E.  Deliberate Indifference

The Eighth Amendment protects prisoners from punishments which "'involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime." Rhodes v. Chapman, 452 U.S. 337, 346 (1981). These principles apply to the conditions of confinement and require that the conditions within a prison comport with "contemporary standard[s] of decency" to provide inmates with "the minimal civilized measure of life's necessities." Id. at 347; See also Farmer v. Brennan, 511 U.S. 825, 832 (1994) (explaining that both the treatment of prisoners and the conditions of their confinement are subject to scrutiny under the Eighth Amendment).

To establish a violation of the Eighth Amendment with respect to medical care, an inmate must prove two elements. See Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). First, the inmate must objectively prove that the deprivation of medical care was "sufficiently serious." Id. Second, the inmate must subjectively prove that prison staff acted with a "sufficiently culpable state of mind." Id.

The objective element is satisfied by proof of the inmate having a serious medical need. Id. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990).  A serious medical need can also exist if a delay in treatment would cause a life-long handicap or permanent loss.  Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987)

The subjective element is satisfied by showing deliberate indifference by prison staff.  Johnson, 145 F.3d at 167.  The Fourth Circuit has summarized what constitutes deliberate indifference:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. Deliberate indifference may be demonstrated by either actual intent or reckless disregard. A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. Nevertheless, mere negligence or malpractice does not violate the eighth amendment.

Miltier v. Beorn, 896 F.2d 848, 851-52 (4th Cir. 1990) (citations omitted). Furthermore, so long as the medical treatment given is adequate, the fact that an inmate would have preferred a different type of care does not constitute deliberate indifference. Chance v. Armstrong, 143 F.3d 698, 703 (2nd Cir. 1998).  Similarly, the fact that other medical professionals would have pursued a different type of treatment does not, by itself, establish deliberate indifference. Hanson v. Smith, 9 F.3d 1557 (10th Cir. 1993). Accordingly, deliberate indifference is "generally not found when some significant level of medical care has been offered to the inmate."  Atwater v. Gabriel, 2012 WL 750754 (M.D.Pa. 2012). In the instant case, even if Plaintiff's fractured collarbone is considered a serious medical problem, thus satisfying the objective element, the medical records establish that he has received substantial and adequate care.

There is no dispute that Plaintiff was injured on May 20, 2014, when he fell from his top bunk.  He was seen by a nurse in Health Services at 11:27 a.m. that same day. Plaintiff reported that his left shoulder and head hurt. Plaintiff appeared to be in distress and was writhing in pain. Swelling was noted to the left posterior parietal region of his scalp. He also had decreased range of active and passive motion in his left shoulder. A sling was applied to his left upper extremity with good pulse, motor and sensory function before and after application. He was prescribed ibuprofen as needed and told that he

could use ice for 20 minutes every 2-3 hours to help minimize pain, swelling and inflammation. He was told to wear the sling for comfort and support. An x-ray was scheduled for the next day. Plaintiff was counseled to return to medical immediately if he experienced increased dizziness/disorientation, nausea/vomiting, abnormal swelling, shortness of breath, or if he felt like he was going to pass out. Finally, he was issued a lower bunk pass until further notice. ECF No. 50-1 at 11-12.

Later that same day, Plaintiff was examined by Defendant Anderson[4] who is a Doctor of Osteopathic Medicine and is board certified by the American Board of Family Physicians. ECF No. 50-1 at 1. Anderson's initial assessment was that Plaintiff's left clavicle, commonly known as the collarbone, was fractured. Id.

On May 21, 2014, the day after he injured himself, an x-ray was taken which showed an acute mid-shaft comminuted fracture of the left clavicle. More specifically, the radiology report found an abnormal, acute, moderately comminuted and moderately displaced mid clavicle fracture. The distal fracture was displaced inferiorly by one shaft width. The acomioclavicular joint was difficult to evaluate because of position. ECF No. 50-1 at 22. The findings were discussed by telephone with Dr. Snead, an orthopedist, who indicated that he would need surgery within two weeks, after first having an evaluation with him within one week. ECF No. 50-1 at 20.

On May 22, 2014, Plaintiff returned to Health Services complaining that his head was really hurting and he was dizzy, nauseated and felt pressure behind his left eye. He was started on an IV of normal saline and was transferred St. Joseph Medical Hospital emergency room via ambulance. ECF No. 50-1 at 29. Later that same day, Plaintiff was

---

[4] Defendant Anderson is employed by the BOP and assigned to serve as a Staff Physician at FCI Gilmer. ECF No. 50-1 at 1.

returned to FCI Gilmer. Id. at 39. He was seen in Health Services and reported that he was still experiencing pain in his forehead, but he described the pain as a two on a scale of one to ten.  Id. Plaintiff indicated that he was told that he had a mild concussion and indicated that he was going to take Naproxen in his housing unit and lay down. Id. The assessment conducted at Health Services indicated that Plaintiff was neurologically intact, and he was instructed to increase fluids and rest. Id. at 40.

On May 24, 2014, Plaintiff returned to Health Services after his cellmate reported that he was forgetful. ECF No. 50-1 at 44. Plaintiff was oriented to person, place, date and time. His vital signs were normal, and Plaintiff stated that he had been feeling better with his nausea almost gone. No abnormalities were found, and he was instructed to return if headaches, changes in vision, or nausea persisted or got worse. His gait was normal with no difficulties noted, and the sling remained in place on the left shoulder. ECF No. 50-1 at 44.

Initially, Plaintiff was scheduled to see Dr. Snead, the orthopedist, on May 28, 2014. However, Dr. Snead rescheduled the appointment for July 7, 2014. ECF No. 50-1 at 197. Dr. Snead did examine Plaintiff on July 7, 2014, at a local hospital. He reviewed an x-ray of Plaintiff's shoulder and noted that the collarbone was fractured. He also noted early callous[5]. Dr. Snead concluded that non-operative treatment should continue with Plaintiff's arm left in a sling and recommended that he be reevaluated in two months. ECF No. 50-1 at 58.

On July 8, 2014, Defendant Anderson made an administrative note in Plaintiff's medical records that he had reviewed the documentation from his appointment with Dr.

---

[5] Callous is the hard bony tissue that develops around the ends of a fractured bonne during healing. ECF No. 50-1 at 4.

Snead and initiated the process to schedule his next appointment with Dr. Snead in approximately six to eight weeks. ECF No. 50-1 at 62. On July 9, 2014, Defendant Savidge[6] reviewed the documentation from Plaintiff's appointment with Dr. Snead and determined that the request for follow-up with Dr. Snead "would be deferred pending a repeat x-ray in 4-6 weeks to check for healing." Id. at 55.

On July 14, 2014, Plaintiff came to Health Services and reported excess swelling and pain due to the fractured collarbone. He described the pain as an eight on a scale of one to ten. Health Services personal noted that Plaintiff's upper shoulder and the left side of his neck were swollen. Health Services personnel noted that requests were in for follow up consults and x-ray in August. ECF No. 50-1 at 67.

An x-ray of Plaintiff's collarbone on August 14, 2014 reflected no change. More specifically, the radiology report indicated no change in alignment of mid clavicular fracture with mild callus formation. ECF No. 50-1 at 68. Defendant Savidge reviewed the x-ray with Dr. Snead and noted that Dr. Snead would evaluate Plaintiff in approximately one month as planned. Id.

On September 18, 2014, Plaintiff came to Health Services and reported that he was experiencing constant pain and muscle spasms. However, Health Services personnel evaluatied him and found no swelling or erythema. Health Services personnel also noted that Plaintiff was scheduled to have another x-ray of his back and collarbone. They instructed Plaintiff to continue Naproxen. ECF No. 50-1 at 76.

On September 24, 2014, Defendant Savage made an administrative note in Plaintiff's medical records reflecting that the prior request to have him evaluated by an

---

[6] Defendant Savidge was the Clinical Director at FCI Gilmer at the time Plaintiff fell out of his bed and was injured. He is currently employed as an Assistant Professor in the Emergency Medicine Department at the West Virginia University School of Medicine. ECF No. 49-3 at 1.

orthopedic specialist had been deferred pending further x-rays and evaluation by a primary care physician. However, Dr. Savidge noted that Plaintiff continued to experience pain and deformity. Therefore, Dr. Savidge requested that Plaintiff be evaluated again by an orthopedic specialist with two weeks. ECF No. 50-1 at 77.

Defendant Anderson evaluated Plaintiff on October 29, 2014[7], at which time Plaintiff reported that he continued to experience a limited range of motion from his collarbone, that he could not lift much weight with his left arm, and he was experiencing crepitus[8] in his collarbone. Defendant Anderson renewed Plaintiff's prescription for Naproxen to treat his pain and noted that he had a pending appointment to be evaluated by an orthopedic specialist. ECF No. 50-1 at 83-86.

On November 5, 2014, Plaintiff again was evaluated by Dr. Snead, the orthopedic specialist. Plaintiff reported that his pain had subsided. Dr. Snead noted no tenderness when he examined Plaintiff's left shoulder. An x-ray revealed that Plaintiff's left clavicle fracture had healed, and Dr. Snead noted that he could resume normal activity. ECF No. 50-1 at 93. Upon his return to FCI Gilmer that same day, Health Services Personnel evaluated Plaintiff and discharged him from orthopedic services because he had met treatment goals for his collarbone fracture. Id. at 95.

Plaintiff left FCI Gilmer approximately 13 months later, on December 1, 2015. During that intervening period, Plaintiff came to Health Services on August 4, 2015, and reported that his back went out while he was walking in an effort to get some exercise.

---

[7] Plaintiff's chief complaint on that date concerned gastrointestinal issues. As a result of the assessment, he was noted to have an unspecified current and chronic depressive disorder, a closed fractured clavicle and esophageal reflux. He was prescribed medication for the unspecified depressive disorder as well as for the esophageal reflux. ECF No. 50-1 at 84-85.

[8] Crepitus is a crackling or grating sound cause by bones rubbing together. ECF No. 50-1 at 6.

However, he did not mention any shoulder pain. ECF No. 50-1 at 156. In addition, on October 9, 2015, Plaintiff went to Health Services because he jammed his right ring finger while playing basketball two to three weeks earlier. Id. at 184.  Again, Plaintiff made no mention of shoulder pain.

As previously noted, Plaintiff bases his claim of deliberate indifference on his allegation that a contract orthopedist determined that the he would need surgery within two weeks of his fall on May 20, 2014. Moreover, Plaintiff alleges that although the initial consult was scheduled for May 28, 2014, it was cancelled by the institution. Therefore, he was not seen by the orthopedist until July 7, 2014, and by then the fracture had begun healing on its own. He further complains that he has never had the surgery as recommended.

Despite Plaintiff's allegations, the record reflects that it was the contract orthopedist, Dr. Snead, who cancelled the original appointment. ECF No. 50-1 at 19. Moreover, Dr. Snead's proposed treatment plan of surgery within two weeks, was based upon a telephone conversation with Defendant Savidge and reflected his preliminary opinion without having personally evaluated Plaintiff. ECF No. 49 at 2. However, when Dr. Snead saw Plaintiff on July 7, 2014, he noted that x-ray revealed fracture midshaft, mild displacement, butterfly fragment and early callus. Accordingly, his plan was to continue with non-operative treatment. ECF No. 50-1 at 58. Furthermore, it was Dr. Snead who determined on November 5, 2014, that Plaintiff's fracture had healed, and he could resume normal activity. ECF No. 50-1 at 93.

There is simply no evidence that either Defendant Anderson or Defendant Savidge ignored expert opinion and deliberately withheld recommended surgery.

Furthermore, the medical records establish that Plaintiff was seen on multiple occasions, was monitored for progress, was prescribed medication to control his pain and was referred for consults as needed.  In short, the medical records fail to establish that Plaintiff's treatment by Medical Services at FCI Gilmore was improper, let alone so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. Moreover, ignoring the treatment preferences of an inmate, in this case surgery, does not constitute deliberate indifference, so long as the given treatment is adequate. Accordingly, Plaintiff has failed to prove the subjective element of his Eighth Amendment claim, and his complaint is without merit.

## RECOMMENDATION

For the reasons stated above, it is hereby **RECOMMENDED** that Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment [ECF No. 48] be **GRANTED**, and Plaintiff's  Complaint be **DISMISSED WITH PREJUDICE**.

Within **fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections identifying those  portions of the recommendation to which objections are made and the basis for such objections. A copy of any objections should also be submitted to the Honorable Irene M. Keeley, United States  District Judge. Failure to timely file objections to this recommendation will result in waiver of the right  to  appeal  from  a  judgment  of this  Court  based  upon  such  recommendation. 28  U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to send a copy of this Report and Recommendation

to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record by electronic means. In addition, because this Report and Recommendation completes the referral from the District Court, the Clerk is **DIRECTED** to terminate the Magistrate Judge association with this case.

Respectfully submitted this 21st day of May, 2018.

*/s Robert W. Trumble*

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE